This is in re J.J. for the appellant, Ms. Mayo, and for the appellee, Mr. McKee, it would be a pleasure to see you. Thank you, Judge. May I please report to counsel? Judge, this, Judge, this side case just has, it's just typical DCFS. They come in, they find this woman, they think she's got mental health problems, they think she's got alcohol problems. I don't know that the state proved she did. Even at a preponderance standard, I don't know that they even proved that much. But what they certainly didn't prove is that the environment was injurious to the minor's welfare. The evidence, the evidence put on by the state was that yes, my client was drinking. Yes, she may or may not have had mental health problems. But yes, she also had somebody who was taking care of her son, her infant son, while she was on her front porch. The evidence from the state is that the officer says, well, I thought Mr. Wilson was a little delayed, a little slow, but we all know that just because somebody is a little delayed or a little slow doesn't mean that they are not an appropriate caretaker for a child. DCFS never even spoke to the man. The one person, Ms. Burns, whose job was to investigate whether or not this was an injurious environment, never even bothered to speak to the caretaker, Mr. Wilson, of this child, never even bothered to go into the house, but then made all kinds of allegations that the child's clothing was inappropriate, not knowing what the temperature of the house was like. The state wholly failed on the issue of injurious environment to prove its case. The record is, I think, very clear on that point. We would ask this court to reverse the trial court and send it back down for a decision not inconsistent with your honors. Because the record is so clear, I will take any questions that the court has. I actually tried this one, so I might be able to shed some light. Judge Maurer heard all this, heard the people, evaluated it all. Why should we second guess his determinations? Judge Maurer is a good judge, a very nice judge, and I like him a lot. He is a new judge, and this is, I think that... A new judge with over 20 years of trial experience. Absolutely, I know, I know. Besides that, we were all once new judges too, Counsel, so it's not necessarily an impeaching observation. I think the problem is that... I think that what happened with the court in this case is it got tied up in the, well, there's a mental health issue. Exactly what DCFS does. There's a mental health issue, there's alcohol, the environment must necessarily be injurious. And I just don't think that's... it's not the standard, it's not what the case law says. The case law is very clear that there are two separate issues. Yes, there can be a mental illness. Yes, there can be alcohol use. That does not necessarily mean that the environment is injurious to the welfare. And I think in this case there was no evidence that the environment was injurious to the minor's welfare. How about when the police officer was there for a fairly lengthy period of time and did not see the child being fed or a respondent caring for the child at all during that time period? I agree with Your Honor that she did not see a respondent... testified she did not see a respondent caring for the child at all during that time period. I believe her testimony was also that she didn't see the child being fed. However, I don't believe her testimony was that she was with the child the whole time. Her testimony was that she spent most of the time with my client. And so the child would have been inside with the caretaker during that time period for most of that day. Did the police officer testify that the caretaker was there that day? Yes, Your Honor. Mr. Wilson was there. How about the medication bottles? He testified that there was prescription medication everywhere and the child was lying on a bed with no side rails. Three-month-old infant. No side protection. I don't remember that testimony, Judge. I don't remember the testimony about no side rails. So I'll have to defer to the court because I just don't remember. With respect to the prescription bottles, again, maybe my client did have a mental illness. Maybe she did. Okay. But that doesn't mean that the child's environment was injurious to his welfare. She had arranged for somebody to take care of him. Somebody was there taking care of him. Well, but if it's a part of the record that the child wasn't fed for a substantial period of time, how can we say that somebody's taking care of him? Judge, I don't believe her testimony was that he hadn't been fed. I think her testimony was that she hadn't seen him be fed, which doesn't mean that he hadn't been fed. Because remember, and I think if you review the transcripts, the officer sat on the porch with my client for the majority of the day. So she did go in and she actually met Mr. Wilson and she watched him change a diaper. But as I recollect the testimony, she was not with that child for most of the day. She was with my client, talking to my client most of the day. Which would have meant for an eight-hour period, the mother provided no care for the child, but did have an alternate caregiver, and she was drinking. And that appeared to be steadily and probably, one would infer that it was a consistent part of her daily life, given the domestic altercation a day or two before, whenever that was, and given her later visits and her, whatever a, I don't know what a psychiatrist would call her, her inability to focus and jumping around with her conversations. Do you think that if you were the police officer, or you were the DCFS person, you would have wanted to at least take the child into care, if however briefly, to determine further what the situation was? No, Judge, I wasn't there. You wouldn't? Well, I know you weren't there. I'm saying you're on the other side of the, you know, you present that at a training program for police officers, and what would you do? Well, I'd probably call a DCFS investigator. Well, what would you do? Well, if the woman appeared to me to be somewhat unstable, regularly drinking, having what appeared to be a slow or developmentally delayed adult son or nephew, whatever it was, caring for the child herself, and this would be a characterization ignoring the child for eight plus hours, and she just had an altercation with, a domestic altercation with her own mother, and threw her out of the house, and police had to be called for that reason, that's kind of an unstable, perhaps somewhat volatile situation. Now, whether it ought to later result in the child being taken away, that's not what I'm asking. I'm asking, what would you do in those circumstances? Judge, I don't know. I wasn't there. Would you feel uneasy?  And it's a troubled situation? It is a troubled situation. And it needs some intervention, whatever, it might be less than what was done, but some intervention. Yes, I would agree with that. I think that, I see this a lot, DCFS jumps the gun to take these kids, and I think in this case we had a caregiver, we had a caregiver. We don't always have that. Sometimes you've just got a troubled individual sitting on the front porch, and nobody is with the child for eight hours. That was not the situation. The situation was... Did Howard testify? Not Howard, I mean the adult. Mr. Wilson? Yeah. He was not available for testimony, Your Honor. That's kind of significant, isn't it, if he's the purported caregiver? Both during that time and perhaps into the future, if the respondent mother is... His testimony could have been very significant, yes, Judge. Yes, Judge. I do want to point out there was one other inconsistency with the drinking. The officer testified and was very adamant that my client had a cup that she carried around, a plastic cup she carried around all day, kept filling it with beer and refilling it with beer. But when you talk to the caseworker on cross-exam sheet, she said, I never saw a plastic cup in my client's hand. So there is some inconsistency regarding how much drink my client was having. And who resolves that? The trier fact. And please forgive me, I didn't mean anything bad about Judge Maurer. No, no, no. It's just... You know such inference. I understand. Thank you. Are there any other questions, Your Honor? No questions. Thank you. Thank you. Again, the standard of review here was a preponderance of the evidence that the child, JJ, was neglected. Basically, more likely than not that he was neglected. Justices pointed out that the trial court was obviously in the superior position to evaluate the credibility and demeanor and conduct of the witnesses. Those findings are given great deference here on review, only overturned if they're against the manifest weight of the evidence or the opposite conclusion is clearly evident. Here the trial court found that the respondent did indeed have an alcohol abuse problem and was indeed mentally ill. More important than that, both of these combined to contribute to an injurious environment to JJ. In the case I cited in my brief in Ray J.W., there the appellate court, I think it was the first district or second district case, found that a respondent's history, just the history of alcohol abuse, can be applied to a determination that the child was subjected to an injurious environment without even any evidence of current alcohol abuse or substance abuse problem. Here, of course, there was concrete evidence of the respondent's current alcohol abuse problem in the form of, of course, the observations of Officer Howard, noting that the respondent was drinking earlier than 8 a.m. throughout the whole day, and also respondents, the father of JJ, Michael Prescott, testified that the respondent did indeed have an alcohol problem, and that it was bad enough that that was the reason he moved out of the house. So it was clear that the respondent had an alcohol problem. It was also clear that she had a mental illness, the main point there being that she admitted to caseworker Burns that she suffered from depression and post-traumatic disorder, that she saw a doctor for these conditions, and that she was medicated for these conditions. She didn't sign any release, so there's no medical records in the evidence, but there was an admission from the respondent that she did indeed suffer from this, at least depression, and quite possibly post-traumatic disorder. How does this, how does this translate into her care of JJ? One concrete example that Officer Howard observed was, of course she failed to take care of him all day, whether there was a caregiver or not was debatable from the evidence, or a suitable caregiver was debatable from the evidence. The trial court found that the caregiver wasn't suitable, that being Mr. Wilson, but leaving that for a minute, JJ was not fed, or at least Officer Howard doubted JJ was fed for the whole time she was there, that being an eight-hour stretch. She suggested to the respondent to feed JJ, and the respondent for a moment thought it would be a good idea, but her lack of focus, her drastic mood swings, resulted in her never following through with the task of actually getting the formula, going up and feeding the child. As for Wilson, the supposed caregiver, Officer Howard observed him with JJ. Both Officer Howard and Caseworker Burns opined that he was developmentally disabled, slow. As for that effect on JJ here, it seemed to Howard that JJ hadn't been fed, or I mean hadn't been changed the whole day when she finally, I think she went up to see JJ either in the late morning or early afternoon, noted that it didn't look like he had been changed all day, suggested to Wilson to change the baby, and Wilson couldn't do this even most basic childcare task without multiple instructions from Howard on how to follow through. Of course, this is a two-month-old baby. Changing the diaper is the most basic and routine task that could come up. There could be multiple other problems that could come up that this caregiver might not be able to handle if he can't even handle changing the child, or if it doesn't even occur to him that the child needs changing for multiple hours. So it wasn't against the manifest way to the evidence for the trial court to not only find that this child was neglected, but that the respondent suffered from an alcohol abuse problem, suffered from a mental illness, and that the caregiver was not suitable, the substitute caregiver, which presumably looking at the evidence might have been the respondent just being put on the spot saying, who's watching this child as you're drinking and becoming intoxicated. She throws out the other person that's in the house as the supposed caregiver. So again, the demonstrated lack of focus resulting in J.J. possibly or likely not being fed for a full eight hours. These occurrences resulted in an injurious environment or a lack of a safe and nurturing shelter for J.J. here, and the trial court's findings weren't against the manifest way to the evidence. Any questions? I don't believe so. Thank you. Rebuttal. Did the court have any follow-up questions for me? I don't think so. Thank you. Good luck on the next few months.